IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JAMES DAVID TORKELSON,

            Case No. 3:10-CV-1183-KI

  Petitioner,

 v.

MARK NOOTH,

            OPINION AND ORDER

  Respondent.

  Anthony D. Bornstein, Assistant Federal Public Defender
  101 S.W. Main Street, Suite 1700
  Portland, Oregon 97204

    Attorney for Petitioner

  Ellen F. Rosenblum, Attorney General
  Andrew D. Hallman, Assistant Attorney General
  Department of Justice
  1162 Court Street NE
  Salem, Oregon 97310

    Attorneys for Respondent

1 - OPINION AND ORDER

KING, District Judge.

This 28 U.S.C. § 2254 habeas corpus action comes before the court on petitioner's Ground One confrontation claim and his Ground Four claim alleging ineffective assistance of counsel. For the reasons that follow, petitioner is entitled to habeas corpus relief as to Ground One.

## BACKGROUND

Petitioner, Rob Smith, Lindsey Ulrich, Gary Brown, Sheila McKenzie, Dimitri Tash, Pam Bailey, and Michelle Hartford were all members of a white supremacist group. On November 1, 2001, the group decided to go to Beulahland, a bar in northeast Portland known to be frequented by the "SHARPS," a rival skinhead gang. Trial Transcript, p. 436. Hartford was not feeling well, and she stayed behind at the Causey Street apartment she shared with Ulrich. *Id* at 614. Hartford spent the evening babysitting Ulrich's 8-month-old son, Reis. *Id*.

When the group arrived at the bar, Bailey asked Ulrich if she had her knife and if she was prepared to use it. *Id* at 439. Ulrich stated that she had her knife and would use it if she had to. *Id.*

Ulrich was excluded from Beulahland because she was underage. *Id.* Brown went outside with Ulrich and asked her if she "had his back." Ulrich responded that she did. *Id.* Shortly thereafter, two SHARP's approached from down the street and began an

2 - OPINION AND ORDER

altercation with Brown, while a third SHARP approached Ulrich and began yelling at her. *Id* at 443-443. Ulrich did not pull out her knife, nor did she attempt to come to Brown's defense. The SHARP's ran away after petitioner, McKenzie, Tash, Smith, and Bailey came out of the bar and Tash drew his knife. *Id* at 443.

The group ultimately returned to an apartment on Madison Street that petitioner shared with Rob Smith. *Id* at 452. In light of Ulrich's unwillingness to come to Brown's defense at Beulahland, petitioner told McKenzie that Ulrich had to be "stripped" of her skinhead identity, a process which includes removal of the person's skinhead symbols and which McKenzie understood would entail a beating. *Id* at 627-28. Bailey and McKenzie proceeded to severely assault Ulrich and strip her of her skinhead symbols while the men watched. *Id* at 464-69, 631-34. The assault continued until petitioner told the women, "That's enough." *Id* at 636-41.

Ulrich subsequently asked to be taken to the hospital, but Bailey refused this request for fear that the police would become involved. *Id* at 481. She told Ulrich to remain seated and awake in a recliner for at least two hours in case she had a concussion. *Id.* Ulrich remained seated for "at least" 90 minutes during which time Bailey checked on her to make sure she was awake. *Id* at 483.

Brown then drove Ulrich to her apartment on Causey Street. *Id* at 484-85. Over the next four days, Brown and Hartford deprived Ulrich of her liberty when they prevented her from: (1) going to

3 - OPINION AND ORDER

the hospital; (2) meeting her husband for coffee; (3) leaving the apartment except to accompany Brown and Hartford on their errands; and (4) talking on the phone to her mother, except for one brief call in which she was told what to say and monitored throughout the conversation. *Id* at 487-494.

On the afternoon of November 5, 2002, Ulrich was able to escape from her apartment when Brown and Hartford were in Hartford's bedroom. *Id* at 491, 505-06, 794. She ran to the apartment complex manager's office and called 9-1-1. *Id* at 506-08. Law enforcement personnel responded to Ulrich's 9-1-1 call and ultimately arrested petitioner and the others.

On December 17, 2001, petitioner was indicted on two counts of Kidnapping the Second Degree on the following theories: (1) petitioner secretly confined Ulrich in a place where she was not likely to be found (the Madison apartment); and (2) petitioner took Ulrich from one place to another (from the Madison apartment to the Causey apartment) with the intent to substantially interfere with her personal liberty. Respondent's Exhibit 102. Petitioner was charged with conspiracy to commit these kidnappings, and was also indicted on one count of Assault in the Second Degree, one count of Robbery in the Second Degree, one count of Coercion, one count of Conspiracy to Commit Assault in the Second Degree, one count of Conspiracy to Commit Robbery in the Second Degree, one count of Assault in the Third Degree, one count of Conspiracy to

4 - OPINION AND ORDER

Commit Assault in the Third Degree, one count of Robbery in the First Degree, and one count of Conspiracy to Commit Robbery in the First Degree. *Id.*

A jury ultimately convicted petitioner on all counts except Conspiracy to Commit Second Degree Assault. Respondent's Exhibit 101. The trial court imposed the following consecutive sentences totaling 300 months in prison: 70-month sentences for each of the Kidnapping convictions, a 70-month sentence for Assault in the Second Degree, and a 90-month sentence for Robbery in the First Degree.[1] Sentencing Transcript, pp. 29-34.

Petitioner took a direct appeal where he argued, in part, that the trial court erred when it admitted portions of Hartford's out-of-court statements to police that served to incriminate him. Respondent's Exhibit 103. The Oregon Court of Appeals affirmed the trial court's decision without opinion, and the Oregon Supreme Court denied review. *State v. Torkelson*, 198 Or. App. 533, *rev. denied*, 339 Or. 66 (2005).

Petitioner next filed for post-conviction relief ("PCR") in Malheur County where the PCR trial court denied relief. Respondent's Exhibit 159. The Oregon Court of Appeals affirmed the lower court without opinion, and the Oregon Supreme Court denied

---

[1] The conspiracy convictions merged with these offenses. Sentencing Transcript, p. 3.

5 - OPINION AND ORDER

review. *Torkelson v. Hill*, 239 Or. App. 430, *rev. denied* 347 Or. 349 (2009).

Petitioner filed his federal Petition for Writ of Habeas Corpus on September 27, 2010. On May 4, 2012, this court dismissed Grounds Two, Three, Five, Eight, and Nine of the Petition. The court also ordered respondent to brief the merits of petitioner's Ground One confrontation claim after concluding that petitioner fairly presented the claim to Oregon's state courts. The following two grounds remain for disposition on the merits:

1. Trial counsel was constitutionally ineffective for failing to raise a state law objection to the exclusion of petitioner's friends from his criminal trial; and

4. The trial court violated petitioner's Sixth Amendment right to a fair trial when it admitted portions of Michelle Hartford's out-of-court statements to police that served to incriminate him.

Petition for Writ of Habeas Corpus (#2), pp. 16-20.

## DISCUSSION

### I. Standard of Review

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence

6 - OPINION AND ORDER

presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. The state court's application of clearly established law must be objectively unreasonable. *Id* at 409.

When a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal habeas court must conduct an independent review of the record to determine whether the state court clearly erred in its application of Supreme Court law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

7 - OPINION AND ORDER

In such an instance, although the court independently reviews the record, it still lends deference to the state court's ultimate decision. *Harrington v. Richter*, 131 S.Ct. 770, 784-85 (2011); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

## II. Analysis

### A. Ground Four: Ineffective Assistance of Counsel

The court first analyzes petitioner's fourth ground for relief wherein he alleges that trial counsel was constitutionally ineffective for failing to raise a state law objection to the exclusion of petitioner's friends from the trial. The PCR trial court denied this claim without providing any rationale, thus this court will independently review the record.

Because no Supreme Court precedent is directly on point that corresponds to the facts of this case, the court uses the general two-part test the Supreme Court has established to determine whether petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009). First, petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether the petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 129 S.Ct. at 1420.

In the midst of his trial, petitioner personally addressed the court about the absence of his friends from his trial:

> I had some friends who were here to show support for me and they were told they could not be here because of alleged intimidation the day before, that someone had tried to approach [Ulrich], is the story I heard.
>
> I spoke to the deputies. When I asked them what the situation was, and I obviously think it's disrespectful, that just because they're here to show support for us -- this is supposed to be open to the public. Why are they being denied the right to be here if they weren't causing any scene back there whatsoever?

Trial Transcript, p. 750.

The prosecutor explained what happened as follows:

> We supplied the facilities folks with information about what our concerns were, which are, in part, one of these fellows, Mr.

9 - OPINION AND ORDER

> Jason Stevens, who has been identified as a skinhead to me by a Portland police officer, that he attempted to approach Ms. Ulrich while she was in the courthouse, and I alerted court facilities about that issue. I wanted additional security to insure that my witnesses in this case who have both testified about the ramifications of what talking to the police and testifying against these men will have for them, I wanted to have additional security. . . . The exclusion order was not made until Thursday, and I think it was, in part, because it was difficult -- this is my speculation now -- it was difficult to supply security and allow my witnesses to move through the courthouse.

*Id* at 753-54.

The trial judge noted that he had not observed any inappropriate behavior by anyone in the courtroom, and that he had not ordered the exclusion of any spectator. He further advised petitioner that it was the Sheriff who was tasked with security within the building, and that the court was unwilling to interfere with the Sheriff's decision on such a matter. *Id* at 754-55.

It is difficult to conclude what specific state law objection counsel could have made which would have convinced the trial judge to intervene in the Sheriff's security decision. In addition, counsel's decision was tactically reasonable where he was "concerned that [petitioner's friends] would be disruptive during the trial and that any misbehavior on their part could and probably would reflect badly on my client in the eyes of the jury." Respondent's Exhibit 150. Given the reported intimidation involving Ulrich and the lack of any real benefit conferred upon

10 - OPINION AND ORDER

petitioner by having his friends at his trial, it was wise for counsel not to press this issue further.

Because the court concludes that counsel's performance did not fall below an objective standard of reasonableness, the PCR trial court's decision denying relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

B. **Ground One: Right of Confrontation**

As discussed in the Background of this Opinion, petitioner was convicted of kidnapping Ulrich: (1) when he and the others held her at the Madison apartment (Count Two); and (2) and when Brown transported Ulrich to the Causey Street apartment where she was held her for a period of four days (Count One). To support the Causey kidnapping, the State introduced out-of-court statements from Michelle Hartford to Detective Musgrave tending to show that Brown and Hartford did not act alone in holding Ulrich at the Causey apartment.[2] Petitioner asserts that the trial court's admission of these statements violated his Sixth Amendment right to confrontation. In the absence of a reasoned decision on this issue from the Oregon state courts, the court independently reviews the record as to this claim.

---

[2] Hartford's statements were deemed admissible under OEC 804(3)(c) because Hartford had invoked her Fifth Amendment right not to incriminate herself such that she was deemed "unavailable," and her statements to the detective tended be against her penal interest. Trial Transcript, p. 341.

11 - OPINION AND ORDER

The parties agree that the introduction of Hartford's out-of-court statements was a violation of the Confrontation Clause,[3] but disagree as to whether petitioner suffered prejudice as a result. In order for petitioner to prove he was sufficiently prejudiced by the confrontation violation to warrant relief, he must show that the improperly admitted statements "had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United states*, 328 U.S. 750, 776 (1946); *Brecht v. Abramson*, 507 U.S. 619, 637-38 (1993).

The testimony at trial revealed that petitioner spent very little time at the Causey street apartment during Ulrich's four-day confinement. When Brown and Ulrich arrived at the Causey apartment, Hartford was there taking care of Reis. Tash and Bailey were also at the apartment. *Id* at 486. At the time, Brown was involved in an intimate relationship with Hartford and apparently spent substantial time at the Causey apartment. According to Ulrich's testimony, Brown was present at the Causey apartment for most of the four days Ulrich was held captive, and was "only gone

---

[3] In *Crawford v. Washington*, the Supreme Court held that in criminal proceedings, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the witness is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. 36, 59 (2004). It is undisputed that petitioner never had an opportunity to cross-examine Hartford with respect to the statements she made to Detective Musgrave.

12 - OPINION AND ORDER

for a little bit, maybe a day." *Id* at 493. Petitioner stayed behind at his Madison street apartment with McKenzie and Smith.

Brown and Hartford bore principal responsibility for Ulrich's confinement at the Causey apartment. When Ulrich's mother called, Hartford told her that Ulrich was at the store even though Ulrich was still within to the apartment. *Id* at 492. Hartford finally allowed Ulrich to speak with her mother with the express instruction to convince her to stop calling. Hartford and Bailey forced Ulrich to tell her mother that she had spent the day at the mall and that she was fine. Ulrich complied, with both Hartford and Bailey sitting with her. *Id* at 492-93.

Ulrich testified that she was unsure how many times petitioner and McKenzie stopped by the Causey apartment, but thought it to be "at least twice." Trial Transcript, p. 497. However, she did not elaborate as to how petitioner might have participated in the deprivation of her liberty. She did not know if petitioner was there when she was prevented from speaking with her mother, but she knew was not present when she had the scripted telephone call with her mother. *Id* at 588-89. Ulrich could not recall if petitioner was there when she was forced to tell her husband during a telephone call that she could not meet him.[4] *Id.*

---

[4] Understandably, it was difficult for Ulrich to remember details in the wake of the assault, and she testified that her "memory is really foggy the entire time" and that the day after

13 - OPINION AND ORDER

According to McKenzie (who testified for the State pursuant to a plea agreement), she only stopped by the Causey apartment once for less than 30 minutes while Ulrich was held there, making no mention as to whether petitioner was with her. McKenzie stated that during this brief visit she was not aware of the fact that Ulrich was not allowed to leave the apartment. *Id* at 645.

The next and final time McKenzie saw Ulrich was at Billygan's restaurant on Sunday night. McKenzie and petitioner met Ulrich and Hartford there for dinner, and McKenzie testified that there was no indication that Ulrich was not there of her own free will. *Id* at 646. According to Ulrich, it was Hartford's idea to go out to dinner because she "wanted to take [petitioner] and McKenzie out to Billygan's so she took me along too." *Id* at 504. Reis came along in his car seat. *Id* at 505.

Ulrich testified that when she went to the restroom at Billygan's, she was not followed even though the restroom was a good distance away from the table she shared with the others. *Id* at 567. According to McKenzie, petitioner's attitude toward Ulrich was that "[h]e didn't want to be anywhere near her." *Id* at 646. When asked if petitioner ever talked about why, McKenzie testified "[b]ecause she should be gone, he couldn't stand the sight of her." *Id* at 647. Hartford and Ulrich went back to the Causey apartment

---

her assault, she could only see out of one eye, "[a]ll the colors were messed up," and all she could hear was buzzing. *Id* at 487-88.

14 - OPINION AND ORDER

after dinner. Petitioner and McKenzie left in their own car, presumably to return to petitioner's Madison apartment. *Id* at 592.

The next day, Ulrich escaped from her apartment. Petitioner and McKenzie showed up at the Causey apartment shortly thereafter. According to McKenzie, petitioner "asked where [Ulrich] was. Just kind of a, hey, what's going on." *Id* at 649. She further testified that it "wasn't like a big deal to me. I didn't notice if nobody was freaking out." *Id* at 650. After discovering Ulrich was gone, nobody went searching for her. Instead, the group "hung out for a little while" and even when the police showed up, McKenzie testified that there "[d]idn't seem like there was any cause for concern." *Id.*

According to Detective Musgrave, however, Hartford told him that "she and Brown had helped hold Ulrich there at the apartment," indicating that they were part of a broader plan. *Id* at 794. It is logical to infer from this testimony that petitioner, having ordered the assault on Ulrich, also ordered her subsequent confinement. Contrary to McKenzie's recollection of petitioner's casual attitude toward Ulrich's absence, Hartford "described [petitioner] as being agitated and demanding when asking where Ms. Ulrich was." *Id* at 795. Thus, she made it clear to the jury that petitioner had a strict expectation that Ulrich would be confined at the Causey apartment.

15 - OPINION AND ORDER

This record reveals that without the introduction of Hartford's statements, the prosecution's case against petitioner based upon the Causey kidnapping was very weak. The testimony at trial seldom placed him at the Causey apartment, and even when it did, there was no testimony that petitioner ordered Brown and Hartford to hold Ulrich captive or that he otherwise assisted in the kidnapping. The only testimony which suggested petitioner's active participation in that crime came in the form of Hartford's out-of-court statements introduced through Detective Musgrave.

Respondent points out that petitioner told McKenzie that if anyone talked about the assault on Ulrich, "they'll disappear." *Id* at 644. According to respondent, this statement shows petitioner's guilt as to the Causey kidnapping. While such a statement clearly constitutes a threat, it does not suggest that petitioner ordered Ulrich transferred to the Causey apartment and confined there indefinitely. Petitioner's statement is more accurately characterized as a death threat, not an intention to simply kidnap anyone who confessed to the crimes committed against Ulrich.

Respondent also takes the position that petitioner was liable for the Causey kidnapping because it was a natural and probable consequence of the assault. The court disagrees. It might be natural to kidnap a person in order to assault her, but it does not logically follow that a person will typically hold an assault

16 - OPINION AND ORDER

victim against her will several days after the assault has concluded.

Respondent also argues that Hartford's statements were not prejudicial because they presented petitioner with an opportunity to impeach McKenzie, a key prosecution witness. Hartford's statements addressed only the Causey kidnapping, a subject on which McKenzie had testified in a manner that was helpful to petitioner. As previously noted, McKenzie testified that petitioner was almost never at the Causey street apartment, she witnessed no deprivation of Ulrich's liberty at the Causey apartment or at the Billygan's restaurant, and that petitioner did not seem concerned when he discovered that Ulrich was not in the apartment. Impeaching this testimony with Hartford's statements, statements which tended to incriminate petitioner on the Causey kidnapping, was not desirable.

Following an independent review of the record, it is clear that Hartford's statements to Detective Musgrave were crucial to petitioner's conviction as to the Causey kidnapping. Hartford's statements were not cumulative of other testimony, and their introduction had a substantial and injurious effect on petitioner's trial because the prosecution's case as to Count One was otherwise very weak. Accordingly, the Oregon state court decisions denying relief on petitioner's confrontation claim constituted unreasonable applications of clearly established federal law, and habeas corpus relief is warranted.

17 - OPINION AND ORDER

The trial court's violation of petitioner's rights under the Confrontation Clause affect only his convictions arising out of the Causey Kidnapping: Kidnapping in the Second Degree (Count One) and Conspiracy to Commit Kidnapping in the Second Degree (Count Six). If the State does not retry petitioner on these charges within 90 days, respondent shall recalculate petitioner's sentence to exclude his convictions for Kidnapping in the Second Degree (Count One) and Conspiracy to Commit Kidnapping in the Second Degree (Count Six) which this court invalidates through this Opinion.

## CONCLUSION

For the reasons identified above, the Petition for Writ of Habeas Corpus (#2) is granted as to petitioner's Ground One confrontation claim. If the State does not retry petitioner on these charges within 90 days, respondent shall recalculate petitioner's sentence to exclude his convictions for Kidnapping in the Second Degree (Count One) and Conspiracy to Commit Kidnapping in the Second Degree (Count Six) which this court invalidates through this Opinion.

In the event this decision is appealed, the court issues a Certificate of Appealability only as to: (1) whether petitioner fairly presented his Ground One claim to Oregon's state courts; and (2) whether the introduction of Michelle Hartford's out-of-court statements had a substantial and injurious effect upon petitioner's trial with respect to his convictions for Kidnapping in the Second

Degree as contained in Count One of the Indictment and Conspiracy to Commit Kidnapping in the Second Degree as contained in Count Six of the Indictment. Any request for a Certificate of Appealability as to any other issue is denied.

IT IS SO ORDERED.

DATED this 23rd day of July, 2012.

/s/ Garr M. King
Garr M. King
United States District Judge

19 - OPINION AND ORDER